NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| PHILIP GOTTHELF and NATHAN GUEDALIA, on behalf of themselves and of those similarly situated, | Civil Action No.: 11-4429 (JLL) |
| Plaintiffs, | **OPINION** |
| v. | |
| TOYOTA MOTOR SALES, U.S.A., INC., et al., | |
| Defendants. | |

This matter comes before the Court by way of Defendants Toyota Motor Sales, U.S.A., Inc. ("TMS"), Toyota Motor North America, Inc. ("TMA"), and Toyota Motor Corporation ("TMC") (collectively, "Toyota")'s Motion to Dismiss Plaintiff Nathan Guedalia's claims, and the claims of the purported class, in light of the court-approved settlement in the Collado/Fixler action in the Central District of California, and to dismiss Plaintiff Philip Gotthelf's claims pursuant to Fed. R. Civ. P. 9(b) and 12(b)(6). [Docket Entry No. 37].   On April 13, 2012, the Court held oral argument on the instant motion. [Docket Entry No. 53].  The Court has considered the submissions of the Parties in support of and in opposition to the instant motion, and for the reasons stated herein, Defendants' Motion is granted in part and denied in part.

## I.  BACKGROUND

Plaintiffs are Philip Gotthelf ("Gotthelf") and Nathan Guedalia ("Guedalia"), residents of New Jersey, and bring this putative class action individually and on behalf of a nationwide class

of "[a]ll persons in the United States who own or lease, or have owned or leased, model years 2006, 2007, 2008, 2009 and 2010 Toyota Prius motor vehicles ["Prius Class Vehicles"] equipped with an optional factory-installed [high-intensity discharge ("HID")] Headlamp System ('Nationwide Class')."  (Compl., ¶¶ 11, 12, 153).

Plaintiffs' putative class action complaint ("Complaint") against Toyota asserts general allegations common to the putative class and individual allegations specific to Plaintiff Gotthelf and Guedalia as they pertain to the purported defects in their Toyota Prius HID Headlight System.  All allegations are centered on an allegedly dangerous and undisclosed safety defect in Toyota Prius optional, factory-installed HID headlights that appear to function normally when first turned on, but have the propensity to stop working without warning ("Unexpected Extinguishment").  (Id., ¶ 2).  When Unexpected Extinguishment occurs, the Prius vehicles temporarily and/or permanently lose illumination from one or, less commonly, both HID headlamps at recurring and unpredictable intervals, exposing the Prius drivers and others on the road to danger, and the drivers to traffic citations.  (Id.).

1.  Factual Allegations of the Putative Class

The general factual claims stated as being common to the putative class are that Toyota marketed Prius Class Vehicles with the HID Headlamp System as being superior to halogen bulbs (the less expensive headlamp option) based on its claims that HID headlamps offer increased visibility, consumes less power, lasts longer than halogen bulbs, and is closer in color to sunlight.  (Id., ¶¶ 36-37).  The Complaint does not specify where and when Toyota marketed said vehicles with the HID Headlamp System, nor when the Plaintiffs had access to this marketing.  The Complaint alleges a series of safety hazards resulting from the Unexpected

Extinguishment of the Prius Headlamp System.  (Id., ¶ 39-87).  First, Plaintiffs assert that when

Unexpected Extinguishment occurs, drivers are not alerted through a warning light or other

mechanism, and the dashboard lights remain illuminated.  (Id., ¶ 42).  Plaintiffs allege that this is

unreasonably dangerous because the extinguishment is unpredictable and results in failure to

illuminate the road for the driver while also failing to notify other vehicles and pedestrians of the

vehicle's presence.  (Id., ¶¶ 43, 45).  The Unexpected Extinguishment thus increases the risk of

automobile accidents, law enforcement citations for moving violations (with resulting penalties),

and greater insurance premiums.  (Id., ¶ 46).  Since the root cause of the failures is alleged in the

Complaint to be in the System's Electronic Control Unit ("ECU") and related circuitry, which

does not properly control and interface with the HID headlamps to produce consistent

illumination, the defect evades detection in the way that a burned-out halogen bulb would not.

(Id., ¶¶ 51-52).  Defendants issued equivalent warranties for the standard halogen bulbs as for the

HID Headlamp System: 36 months or 36,000 miles, whichever occurred first, even though the

HID Headlamp System was an upgrade option for which Plaintiffs and class members paid

additional consideration.  (Id., ¶ 91).

      Plaintiffs allege that Toyota had substantial knowledge of the HID Headlamp failure as

early as 2005, when they learned of such defects through "consumer complaints."[1]  (Id., ¶ 97-

101, 103).  While the Complaint is not clear about what these early consumer complaints

consisted in, where they were sent to and to whom, Plaintiffs earlier in their Complaint state and

---

[1]During the April 13, 2012 oral argument on the instant Motion, Plaintiff's Counsel stated
on the record that the year number 2005 in Paragraph 103 of the Complaint was a typographical
error, and that the proper year should have been written in said Paragraph was 2007.  (Apr. 13,
2012 Hr'g Tr. 44:23 - 45:15).

cite to consumer complaints filed with the National Highway Traffic Safety Administration ("NHTSA") and available on the internet, complaining of Unexpected Extinguishment events in the Class Vehicle and dating from July 1, 2007 to November 10, 2008.  (Id., ¶ 87).  It is on the basis of these NHTSA consumer complaints, as well as Toyota's own Books of Knowledge, internal testing, information on dealership repair orders, warranty data, records of customer complaints, direct consumer reporting to Toyota and its dealerships who are authorized agents for vehicle repairs, and "other sources" that Plaintiffs broadly assert that Toyota knew of the defect in the HID Headlamp System.  (Id., ¶ 99).  Plaintiffs further allege that only Toyota had access to the cumulative information about the significant risk of intermittent HID headlamp failure.  (Id., ¶ 100).

Plaintiffs' Complaint states the following facts pertaining to Toyota's alleged intentional concealment of their knowledge of the HID Headlamp System defect.  (See generally, id., ¶¶ 102-113).  First, Plaintiffs assert that, even though Defendants knew of the defect, they did not disclose the defect at the time of purchase or lease to Toyota Prius customers selecting the optional HID Headlamp System.  (Id., ¶ 104).  Plaintiffs allege that, even when Prius owners and lessees directly contacted Toyota to inquire about whether Toyota knew anything about intermittent HID headlamp failures, they denied knowledge of any such problem or defect.  (Id., ¶ 54).  The Complaint does not state who made these calls or when, and Plaintiffs themselves are not asserted to have made such inquiries.  Plaintiffs further claim that Toyota concealed the defect from customers by: (1) never notifying Toyota-authorized dealerships of the HID Headlamp System defect, which prevented said dealerships from alerting their customers and properly diagnosing the problem; and (2) providing equally defective HID Headlamp System

parts to its authorized dealers for use in repairing Prius owners' and lessees' HID headlamps. (Id., ¶¶ 55-56, 105). The Complaint alleges that, "[t]o date, Toyota has not notified Plaintiffs and the proposed class members of Class Vehicle owners and lessees about the HID Headlamp System defect" or that "their Priuses suffer from a systemic defect that causes intermittent HID headlamp failures, implemented a reliable remedy for the defect, or offered to reimburse these consumers fully for their initial or subsequent 'repairs.'"   (Id., ¶¶ 60-61). Toyota has also not recall the Prius motor vehicles to repair the defect.  (Id., ¶ 62). Plaintiffs contend that Toyota has, however, implemented a "secret policy" whereby it will cover all or part of the cost of HID Headlamp System replacements, but only for consumers who contact Toyota's corporate customer assistance center to complain about intermittent HID headlamp failures, and even then, Toyota will not disclose to consumers that the intermittent headlamp failure is a result of an inherent defect in the HID Headlamp System or that the problems are likely to recur in the future.  (Id., ¶ 67).

On May 6, 2009, NHTSA notified Christopher J. Tinto, the Vice President of Technical and Regulatory Affairs of TMA for the benefit of TMC, that it had opened an investigation of the HID headlamp failures in the 2006 and 2007 Toyota Prius.  (Id., ¶ 79). Plaintiffs allege that TMC is at the center of Toyota's organization and management based on a review by the former U.S. Transportation Secretary, and TMC had a longstanding common practice of maintaining common corporate officers of TMA and TMS to assure central control.   (Id., ¶¶ 81, 83).   The NHTSA investigation: (1) uncovered 2,200 consumer complaints about the HID headlamps failing; (2) revealed that Toyota received 27,600 warranty claims on the issue as of September 2009; and (3) estimated that no less than 100,000 Prius vehicles may have been affected.   (Id.,

¶¶ 84-85).  In September 2009, NHTSA closed its investigation of the HID headlamp defects after Toyota agreed to investigate the problem and address customer complaints on the issue. (Id., ¶ 86).

On December 28, 2009, Toyota sent a letter to Prius owners and lessees informing them of a new "Customer Support Program" for implementing rebates and price reductions for HID Headlamp System replacement parts ("CSP Letter"), but Plaintiffs assert that the CSP Letter fails to acknowledge any latent product defect.[2]   (Id., ¶ 69).  In the Letter, Toyota offered to reimburse Prius owners and lessees who had incurred costs for repair or replacement relating to the defective HID Headlamp System, but they did not offer to reimburse said owners and lessees for traffic tickets or increased insurance premiums due to the Unexpected Extinguishments. (Id., ¶ 68).  The Letter also promised: (1) partial reimbursement to customers who grossly overpaid for replacement HID headlamps at Toyota dealerships (though the customers were expected to pay the minimum additional cost of $150 per HID headlamp replacement; and (2) reimbursement to customers who had replaced the HID headlamp and ECU with what Plaintiffs allege to be defective HID headlamps and ECUs.  (Id., ¶¶ 69-70, 73).  The Letter promised no relief for prospective remedies, for those who incurred labor costs, or for those who did not repair their headlamps at authorized Toyota dealers.  (Id., ¶ 72).  Further, Plaintiffs allege that the Letter provided misguided recommendations to fix the problem that concealed the fundamental defect, namely, by advising customers to avoid turning the HID headlamps on while they were still hot.   (Id., ¶ 74).  Plaintiffs assert that the HID Headlamp System failed to meet their and a

---

[2]In his final order approving the Collado/Fixler settlement agreement, Judge Manuel Real made a finding that the CSP Letter issued by Toyota was "tantamount to an admission of liability subject only to the number of possible claims."  (Mallow Decl., Ex. H, at 8).

reasonable consumer's expectations that a purchased or leased vehicle includes safe and functional headlamps, and they state that, had they known of the alleged defect, they would not have bought or leased the Class Vehicles with the optional HID Headlamp System at the prices they paid, if at all.  (Id., ¶¶ 88-96).

2.  Plaintiff Gotthelf's Factual Allegations

Plaintiff Gotthelf purchased a new 2006 Prius from Parkway Toyota on or about April 28, 2006, at a purchase price of approximately $29,524.00 and with an additional extended warranty in the amount of $1,200.00.  (Id., ¶¶ 114-15).  Gotthelf purchased the vehicle with the optional factory-equipped HID Headlamp System for additional consideration, and Toyota did not inform him that the Prius' HID Headlamp System was defective either at the time of purchase or at any other time.  (Id., ¶ 116, 120).  Further, Gotthelf received no communication from Toyota concerning the headlamps prior to his receipt of the CSP Letter.  (Id., ¶ 120).

In October 2009, while driving at sunset, Gotthelf was informed by a pedestrian that one of the HID headlamps of his Toyota Prius was extinguished, but a short time later, the HID headlamp was working again.  (Id., ¶ 121).  On October 19, 2009, approximately three years and five months after his purchase of the vehicle, Gotthelf took his Prius to Parkway Toyota, an authorized Toyota repair facility, for repair – the vehicle at that time had 49,907 miles on it.  (Id., ¶ 122).  On that date, Parkway Toyota's service personnel agent (the "Representative") notified Gotthelf that the HID headlamps for the 2006 Prius had a propensity to turn on and off without notice, and that the service department had determined that his HID headlamp was defective but was no longer under warranty.  (Id., ¶ 124).  Gotthelf was charged and paid $275.00 for the replacement part and labor to replace the driver-side HID headlamp.  (Id.).  Gotthelf asked the

Representative if the replacement part was equally defective, and the Representative told him that Toyota was aware of the defective factory-installed HID headlamps, and that the replacement HID headlamps were re-designed to perform as originally expected and intended, which was the life of the Toyota Prius.  (Id., ¶ 127).

In the latter part of November 2009, Gotthelf's passenger-side HID headlamp began to intermittently experience Unexpected Extinguishment, so Gotthelf contacted Parkway Toyota's service department.  (Id., ¶ 128).  The service department recommended turning the passenger-side HID headlamp on and off one or more times, and also recommended that Gotthelf continue to operate the Prius with the defective HID headlamp until it completely failed since the repair and replacement would again cost $275.00.  (Id.).  Gotthelf opted out of the Collado/Fixler class action in the Central District of California.  (Defs. Br., at 2; Mallow Decl., Ex. N, "Timely Requests for Exclusion [in In re Collado, et al. v. Toyota Motor Sales, U.S.A., Inc] Received"; Apr. 13, 2012 Hr'g Tr. 4:21 - 5:2).

3.  Plaintiff Guedalia's Factual Allegations

Guedalia leased a new 2006 Prius with the optional factory-equipped HID Headlamp System, for which he paid additional consideration, through Hudson Toyota on or about August 30, 2006.  (Id., ¶¶ 132-33).  Toyota did not inform Guedalia that the Prius' HID headlamps were defective when he leased the Prius, or at any other time.  (Id., ¶ 137).  Further, Guedalia received no communication from Toyota concerning the headlamps prior to his discovery that the HID headlamps had failed.  (Id.).

In July 2009, Guedalia discovered that his passenger-side HID headlamp was not functioning properly, although it started working again a short time later.  (Id., ¶ 138).  Guedalia

took his Prius to the Hudson Toyota, an authorized Toyota repair facility, on July 13, 2009,

approximately two years and ten months after leasing the vehicle, at which time the vehicle had

been driven for 59,021 miles.  (Id., ¶¶ 139-40).  Hudson Toyota checked the passenger-side

headlamp and advised Guedalia that he needed to replace it, which he did.  (Id., ¶ 140).

However, Hudson Toyota was not able to install the replacement HID headlamp until August 24,

2009, with a total charge for the part and labor amounting approximately to $225.00 plus tax,

which he paid.  (Id.).

On or about February 24, 2010, Guedalia returned to Hudson Toyota because he

continued to notice that his driver-side headlamp was experiencing Unexpected Extinguishment.

(Id., ¶ 141).  Hudson Toyota told him that the driver-side headlamp needed replacing at a total

cost of $215.48.  (Id.).  Guedalia paid that amount, and Hudson Toyota replaced the driver-side

headlamp.  (Id.).  Guedalia has thus spent a total of $440.48 to date for the diagnosis and repair

of his Prius' HID Headlamp System.  (Id., ¶ 142).

Guedalia did not opt out of the Collado/Fixler action in the Central District of California,

and on July 5, 2011, he filed an objection letter addressed to the Honorable Manuel L. Real. (See

Mallow Decl., Ex. M, dated July 5, 2011, filed in Collado v. Toyota Motor Sales, U.S.A., Inc.,

C.D. Cal. No. 10-cv-3113, Docket Entry No. 167-2 ("Objection Letter"); Apr. 13, 2012 Hr'g Tr.

4:9-20).  On January 20, 2012, Guedalia was issued a settlement check from the Toyota Motor

Sales, U.S.A., Inc., Settlement Fund in the amount of $369.13, reimbursing him in full and final

settlement of his claims, and the check was cashed by Guedalia as evidenced by a signed

endorsement on the back of the check on February 6, 2012, and by the representations of his

Counsel at this Court's oral argument on April 13, 2012.  (See id.; Defs. Reply Br., at 3 and Ex.

9

1).

> 4.  *Collado/Fixler* and the Procedural History of *Gotthelf. v. Toyota Motor Sales, et al.*

The first putative nationwide class action filed against Toyota for the purported defect in the Toyota Prius HID headlights was Collado v. Toyota Motor Sales, filed in the Central District of California by plaintiff Carlos Collado, a New York resident, on May 1, 2009.  (Def. Br., at 3).  The complaint requested, inter alia, restitution, pre- and post-judgment interest, equitable relief, and attorneys' fees and costs of suit for alleged violations of California's Consumers Legal Remedies Act (Cal. Civ. Code §§ 1750, et seq.) and Unfair Competition Law (Cal. Business and Professions Code, Section 17200, et seq.).  Compl., at 8-11, Collado, et al. v. Toyota Motor Sales, U.S.A., Inc., No. 10-03113 (C.D. Cal. May 1, 2009).  The facts alleged that were common to the putative class in that complaint were that owned or leased 2006 and 2007 Toyota Prius vehicles suffered from a dangerous but undisclosed safety defect in that their factory-installed HID headlights sporadically stopped working while the vehicle was being driven, and that Toyota was aware of the headlight problems but concealed the defect from its consumers.  (Id., at 1).  On July 27, 2009, the Collado action was transferred to the Southern District of New York, and on February 16, 2010, Elliot Fixler, a Florida resident, filed a similar complaint against Toyota Motor Sales in the Southern District of New York, alleging almost identical facts and legal theories as those stated in the Collado complaint.  See Fixler v. Toyota Motor Sales, U.S.A., Inc., No. 10-03124 (C.D. Cal. April 22, 2010).  On April 16, 2010, both cases were transferred to the Central District of California, and on May 12, 2010, were coordinated by Judge Manuel Real. (Defs. Mot. to Dismiss, Decl. of Michael L. Mallow ("Mallow Decl."), Ex. C, "Order Coordinating Cases in Collado").

10

Those coordinated actions continued to proceed in the Central District of California when Plaintiffs filed their putative class action complaint in this Court on August 30, 2010. [Docket Entry No. 1].  On September 17, 2010, Plaintiffs filed a motion before the Judicial Panel on Multidistrict Litigation ("JPML") to transfer all related Toyota Prius HID Headlamp Litigation extinguishment cases in eight separate states, including the only two putative class actions seeking certification of overlapping nationwide classes in New Jersey and California, to this Court.  (Defs. Br., at 10; Mallow Decl., Ex. K).  On October 6, 2010, Plaintiffs filed an ex parte motion to stay the Collado/Fixler action, but that application was denied on October 18, 2010 on grounds that it did not qualify for ex parte consideration.  See Collado v. Toyota Motor Sales, U.S.A., Inc., C.D. Cal. No. 10-cv-3113, Docket Entry No. 126 ("Order Denying Ex Parte Application by Intervenors to Enjoin by Temporary Stay").

On November 12, 2010, Defendants filed a motion to stay this matter in light of the pending settlement in the first-filed Collado/Fixler action, or, in the alternative, sought to dismiss Plaintiffs' Complaint. [Docket Entry No. 12].  The Court granted Defendant's motion to stay on November 29, 2010, staying the matter until February 21, 2011. [Docket Entry No. 15].  The Parties modified their briefing schedule with respect to Defendants' Motion to Dismiss, and refiled said Motion along with another motion to stay, requesting that this Court stay the matter pending the approval of the settlement agreed upon by the parties in the Collado/Fixler action. [Docket Entry Nos. 16, 19].  On January 25, 2011, the Court granted Defendants' motion to stay the matter until July 29, 2011, extending the stay to August 19, September 16, and October 31, 2011 upon notification by Defendants of: (1) Judge Real's pending preliminary approval of the settlement in Collado/Fixler; (2) Judge Real's pending final approval of the same; and (3) Judge

11

Real's request for supplemental briefing on attorney's fees prior to his final approval of the settlement agreement.  [Docket Entry Nos. 26, 28, 29, 31].  On November 30, 2010, the JPML denied Plaintiffs' motion to transfer the Prius HID headlamp products liability cases to this Court.  (Pls. Opp'n, Decl. of Edward M. Bernstein ("Bernstein Decl."), Ex. I, "Order Denying Transfer by JPML Panel").

On October 21, 2011, Defendants informed the Court of the outcome of the October 17, 2011 final approval hearing before Judge Real, in which he granted final approval to the nationwide settlement class in the Collado/Fixler action pursuant to Fed. R. Civ. P. 23(e), finding the settlement to be fair, reasonable and adequate.  [Docket Entry No. 32].  The Parties then jointly requested to stay this action and establish a briefing schedule for motion practice following the resolution of the Collado/Fixler action.  [Docket Entry Nos. 32, 33].  The Court granted the Parties' request for a stay on October 28, 2011 until January 2, 2012. [Docket Entry No. 34].  Defendants filed the instant Motion to Dismiss Plaintiffs' Complaint on December 23, 2011, and oral argument was heard on April 13, 2012. [Docket Entry Nos. 37, 53].

## II.  LEGAL STANDARD

For a complaint to survive dismissal, it "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949  (2009) (citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  The plausibility standard is not akin to a "'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully"; mere consistency with liability is insufficient. Id.  In evaluating the sufficiency of a complaint, the Court must accept all well-pleaded factual

allegations in the complaint as true and draw all reasonable inferences in favor of the

non-moving party.  See Phillips v. County of Allegheny, 515 F.3d 224, 234 (3d Cir. 2008).  But,

"the tenet that a court must accept as true all of the allegations contained in a complaint is

inapplicable to legal conclusions.  Threadbare recitals of the elements of a cause of action,

supported by mere conclusory statements, do not suffice." Iqbal, 129 S.Ct. at 1949.  The burden

of proof for showing that no claim has been stated is on the moving party.  Hedges v. U.S., 404

F.3d 744, 750 (3d Cir. 2005)(citing  Kehr Packages, Inc. v. Fidelcor, Inc., 926 F.2d 1406, 1409

(3d Cir. 1991)).  During a Court's threshold review, "[t]he issue is not whether a plaintiff will

ultimately prevail but whether the claimant is entitled to offer evidence to support the claims."  In

re Rockefeller Ctr. Props., Inc., 311 F.3d 198, 215 (3d Cir. 2002).  In accordance with the

adoption of the new Iqbal standard by the Supreme Court, the Third Circuit held that the "no set

of facts" standard set forth in Conley v. Gibson, 33 U.S. 41, 45-46 (1957) no longer applied to

federal complaints.  Fowler v. UPMC Shadyside, 578 F.3d 203, 210 (3d Cir. 2009).  District

courts now reviewing complaints for failure to state a claim must engage in a two-part analysis:

> First, the factual and legal elements of a claim should be separated. . . . Second, a District
> Court must then determine whether the facts alleged in the complaint are sufficient to
> show that the plaintiff has a "plausible claim for relief."

Id. (citations omitted).

Fraud claims must meet a heightened pleading standard under Fed. R. Civ. P. 9(b), which

requires that "in all averments of fraud or mistake, the circumstances constituting fraud or

mistake shall be stated with particularity."  Fed. R. Civ. P. 9(b).  "To satisfy this heightened

standard, the plaintiff must plead or allege the date, time and place of the alleged fraud or

otherwise inject precision or some measure of substantiation into a fraud allegation." Frederico

13

v. Home Depot, 507 F.3d 188, 200 (3d Cir. 2007)(citing Lum v. Bank of Am., 361 F.3d 217, 224 (3d Cir. 2004)).  The plaintiff must also allege "who made the purported misrepresentations and what specific misrepresentations and what specific misrepresentations were made."  Id.

Motions to dismiss may consider facts warranting judicial notice even if those facts were not referenced in the pleadings.  See Southern Cross Overseas Agencies, Inc. v. Kwong Shipping Group Ltd., 181 F.3d 410, 426 (3d Cir. 1999)(stating that Rule 12(b)(6) motion may only consider the facts alleged in the pleadings, the documents attached thereto as exhibits, and matters of judicial notice).  A court may take judicial notice of the record from a previous court proceeding between the parties without converting the motion to a motion for summary judgment.  See, e.g., Toscano v. Conn. Gen. Life Ins. Co., 288 Fed. Appx. 36, 38 (3d Cir. 2008); Anjelino v. N.Y. Times co., 200 F.3d 73, 88 (3d Cir. 1999).  Federal Rule of Evidence 201(b) provides that "[a] judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot be reasonable questioned."  Fed. R. Evid. 201(b).  A court may take judicial notice at any stage of the proceeding.  Fed. R. Evid. 201(d).

This Court's jurisdiction over this matter is premised on the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d) and on diversity pursuant to 28 U.S.C. § 1332(d)(2).  The Parties stipulate that, for the purposes of this motion to dismiss, New Jersey law applies to Plaintiffs' state law claims as asserted in their Complaint.  (Defs. Reply Br., at 4 n. 2).  With this framework in mind, the Court turns now to Defendant's motion.

## III.  DISCUSSION

.      **1. *Res Judicata* as to Plaintiff Guedalia and the Putative Class's Claims**

a.  The Parties' Arguments

Defendants argue that the claims of Plaintiff Guedalia and the putative nationwide class are precluded on the basis of <u>res judicata</u> since: (1) a final judgment on the merits was rendered in the <u>Collado/Fixler</u> action as per Judge Real's Final Approval Order of the nationwide class action settlement in the Central District of California; (2) the same parties or their privies were involved in that nationwide certified class, defined as "[a]ll purchasers and/or lessees of any 2006, 2007, 2008 and 2009 model year Toyota Prius vehicle originally factory equipped with genuine high intensity discharge ('HID') headlights who reside in the United States"; (3) the instant action is based on the same causes of action as those asserted in <u>Collado/Fixler</u>, namely, claims brought for product defects under consumer protection laws for fraud and unfair competition or business practices; and (4) the <u>Collado/Fixler</u> settlement is binding as to Plaintiff Guedalia and the putative class since they received notice and had an opportunity to be heard in the Central District of California, meeting the requirements of the Due Process Clause.  (Defs. Br., at 8-16).

Defendants first argue that the judicially approved settlement agreement in the <u>Collado/ Fixler</u> action is a final judgment for the purposes of claim preclusion, and that the express terms of the "Release of Claims" in the settlement agreement determines the bounds of preclusion after settlement.  (<u>Id.</u>, at 11).   The Release of Claims provision states as follows:

> Upon the Effective Date, the Plaintiffs and each Class Member shall be deemed to have, and by operation of the Final Order and Judgment shall have, released, waived, and discharged any and all legal claims or causes of action of any nature whatsoever, including claims that have been or could have been asserted against Toyota, Toyota

15

> Motor Corporation, and their subsidiaries, affiliates and suppliers, in the Actions or in any other complaint, action, or litigation in any other court or forum regarding the Class Vehicle's Headlight Parts as alleged in the Actions.

(Id.; Mallow Decl., Ex. D, "Collado Settlement Agreement," at 12-13). Second, Defendants argue that Guedalia and the putative class who are involved in the instant action are identical parties to those included in the certified class in Collado/Fixler, and Guedalia specifically is precluded as he not only received class notice, had the opportunity to be heard in the California District Court in his July 5, 2011 filing of an objection letter to the proposed settlement, but also received a settlement check and cashed it as evidenced by exhibits filed with Defendants' Reply Brief. (See Defs. Br., at 9-13; Mallow Decl., Ex. M; Defs. Reply Br., Ex. 1). Further, Defendants argue that the instant action shares the same operative facts as the now-settled Collado/Fixler action: the Unexpected Extinguishment events resulting from defects in the 2006 to 2009 Toyota Prius models' HID Headlamp Systems. (Defs. Br., at 10-11).

Defendants finally assert that class notice in the Collado/Fixler class settlement exceeded the required due process threshold since: the court approved the notice, the notice was provided to the Attorneys General of all fifty states, and the claim administrator used VINs to locate 293,670 class members eligible to receive benefits under the settlement. (Defs. Br., at 14). The claim administrator also ran class member addresses against the National Change of Address database to ensure they were updated, and class notices that were returned by the U.S. Postal Service were promptly re-mailed using updated addresses from Toyota's customer database. (Id.). Information about the Collado/Fixler settlement was also published on the internet. (Id.). Finally, Defendants argue that the class notice provided all necessary information regarding the settlement. (Id., at 15).

Plaintiffs respond by arguing that res judicata should not be a bar to either Guedalia or the putative class's claims since: (1) no final judgment exists on the merits;[3] (2) meaningful discovery was not pursued by the plaintiffs in the Collado/Fixler action since it only lasted two months, there was no substantive factual discovery and no expert discovery at all; (3) the settlement was not fair or equitable under Fed. R. Civ. P. 23(e) since the warranty extension had already expired for more than 95% of the Class and touches only 3.7% of the total class (11,000 out of 293,670); and (4) Rule 23 requirements for class certification were not met in Collado/Fixler since Guedalia and the putative class were not adequately represented and no choice of law analysis was done to evaluate the effects, if any, on the multiple class actions pending at the same time in one or more federal courts.  (Pls. Opp'n Br., at 15-24).

As a result of those defects, Plaintiffs argue that this Court should not give full faith and credit to the Central District of California's approval of the settlement.  (Id., at 20).  Specifically, Plaintiffs argue that discovery in the Collado/Fixler action was deficient since declarations and other supporting pleadings by counsel offered contradictory statements, stating first, when the parties were requesting settlement approval, that extensive factual discovery had been conducted, but later stating that virtually no substantive factual discovery had occurred while arguing over attorneys' fees.  (Id., at 16-17).  Plaintiffs further argue that discovery had been stayed while the

---

[3]While Plaintiffs argue that there was no final judgment on the merits on page 15 of their Opposition Brief, they neither brief nor argue the issue beyond making that statement.  The Court will accordingly construe Plaintiffs' rejection of the judgment as final in light of Plaintiffs' other arguments, that, "[i]n a settlement without class certification the judgment will not have res judicata effect on the claims of absent members.  In re Gen. Motors Pick-Up Truck Fuel Prod. Liab. Litig., 55 F. [] 3d 768, 800 (3d Cir. 1995)." (Pls. Apr. 17, 2012 Letter, at 4 [Docket Entry No. 51]).  As such, the argument may be incorporated into Plaintiffs other arguments that the class certification in the Central District of California may not be granted full faith and credit by this Court.

actions were pending in New York, and remained stayed following their transfer to California, limiting the scope of discovery. (Id., at 17). Document production was thus short-lived, and after the memorandum of understanding was entered, the case entered settlement posture and expert discovery was not conducted nor were depositions taken. (Id., at 17-18). While Toyota's attorneys in the California action assert that 88,000 pages of Toyota's documents were produced, the fee applications of Plaintiffs' attorneys have virtually no time recorded for the review of any document discovery. (Id., at 19).

Plaintiffs also assert that the settlement was unfair under Rule 23(e) as the warranty extension had already expired for 95% of the class and the reimbursement amounts were unfairly low given the reasonable expectation of consumers that the additional consideration charged for the premium HID headlamps meant that the headlamps would last the life of the vehicle. (Id.). Therefore, Defendants argue that the settlement was only about attorneys' fees, and Guedalia and the putative class were not adequately represented since the attorneys in Collado/Fixler did not focus on vigorously pursuing class claims through substantial discovery, and no consideration was given by the court as to the action's relationship with the instant action. (Id., at 21-23).

Defendants reply by pointing out that Plaintiffs appear to concede: (1) that the settlement class is identical to the putative class here; (2) that the claims in the instant action arise from the same operative facts as those in Collado/Fixler; and (3) that the settlement notice was sufficient. (Defs. Reply Br., at 2-3). Defendants assert that the settlement was fair since: (1) Judge Real made express findings that it was fair, adequate and reasonable since it provides an extended warranty and reimbursement for all class members; and (2) that discovery was adequate in accordance with Judge Real's express findings because the parties exchanged around 86,000

18

pages of documents, both sides propounded and responded to written discovery and interrogatories, and Judge Real reviewed the attorneys' detailed billings.  (Id., at 5-7).  Finally, Defendants claim that the settlement and class counsel fairly and adequately represented plaintiffs and the putative class because, in accordance with Judge Real's findings, counsel had a "firm grasp on the strengths and weaknesses of the case," had "substantial experience with class action settlements," the agreement was negotiated at arm's length, and a mediator involved in the case declared likewise.  (Id., at 7-8).

### b.  Law and Analysis

Res judicata functions as an affirmative defense to suit, placing the burden on the party asserting such a defense to show that it applies.  United States v. Athlone Industries, Inc., 746 F.2d 977, 983 (3d Cir. 1984).  Application of the claim preclusive aspect of the res judicata doctrine requires a showing that there has been: (1) a final judgment on the merits in a prior suit involving (2) the same parties or their privies and (3) a subsequent suit based on the same causes of action.  Id.  Whether two causes of action are identical depends, in general, on a consideration of: "(1) whether the acts complained of and the demand for relief are the same (that is, whether the wrong for which redress is sought is the same in both actions); (2) whether the theory of recovery is the same; (3) whether the witnesses and documents at trial are the same (that is, whether the same evidence necessary to maintain the second action would have been sufficient to support the first); and (4) whether the material facts alleged are the same."  Id., at 984.  "Claim preclusion . . . prohibits reexamination not only of matters actually decided in a prior case, but also those that parties might have, but did not, assert in that action."  Edmundson v. Borough of Kennett Square, 4 F.3d 186, 189 (3d Cir. 1993).  In other words, a new legal theory "does not

make the second case different for purposes of claim preclusion." <u>Jones v. Lapina</u>, 450 Fed. Appx. 105, 108-9 (3d Cir. 2011).

Pursuant to the Full Faith and Credit Statute, 28 U.S.C. § 1738, "records and judicial proceedings . . . shall have the same full faith and credit in every court within the United States . . . as they have by law or usage in the courts of such State, Territory or Possession from which they are taken." 28 U.S.C. § 1738; <u>R & J Holding Co. v. Redevelopment Auth. of the County of Montgomery</u>, 2011 U.S. App. LEXIS 24406, at * 4 (3d Cir. Dec. 9, 2011)(precedential opinion). "Where one or both suits have been brought under federal diversity jurisdiction, the collateral estoppel and res judicata laws of the forum states may become applicable through <u>Erie R.R. v. Tompkins</u>, 304 U.S. 64 (1938), the full faith and credit clause, or 28 U.S.C. § 1738." <u>Gambocz v. Yelencsics</u>, 468 F.2d 837, 841 (3d Cir. 1972). Section 1738 "has long been understood to encompass the doctrines of res judicata, 'claim preclusion,' and collateral estoppel, or 'issue preclusion.'" <u>R & J Holding</u>, at * 4 (quoting <u>San Remo Hotel, L.P. v. City & Country of San Francisco</u>, 545 U.S. 323, 336 (2005)).

Judicial approval of settlement agreements are considered final judgments on the merits for the purposes of claim preclusion. <u>Toscano v. Conn. Gen. Life Ins. Co.</u>, 288 Fed. Appx. 36, 38 (3d Cir. 2008). A class representative can enter into a settlement that bars future claims by class members "even though the precluded claim was not presented, and could not have been presented." <u>In re Prudential Ins. Co. of Am. Sales Practice Litig.</u>, 261 F.3d 355, 366 (3d Cir. 2001). "The key inquiry is whether the factual predicate for future claims is identical to the factual predicate underlying the settlement agreement." <u>Monaco v. Mitsubishi Motors Credit of Am., Inc.</u>, 34 Fed. Appx. 43, 45 (3d Cir. 2002); <u>Freeman v. MML Bay State Life Ins. Co.</u>, 445

Fed. Appx. 577, 579 (3d Cir. 2011).

Due process may preclude a class action settlement from barring subsequent claims on behalf of class members.  The "general principle is that 'there has been a failure of due process only in those cases where it cannot be said that the procedure adopted, fairly insures the protection of the interests of absent parties who are to be bound by it.'" In re Diet Drugs Prods. Liab. Litig., 431 F.3d 141, 145 (3d Cir. 2005)(quoting Hansberry v. Lee, 311 U.S. 32, 42 (1940)). Due process protections required for the out-of-state class plaintiffs in California are "significantly lower than those needed for defendants. . . . because there are inherent protections built into the class action device and because they are subjected to lesser burdens than defendants."   Grimes v. Vitalink Communications Corp., 17 F.3d 1553, 1560 (3d Cir. 1994). Thus, the Central District of California "need only have provided 'notice plus an opportunity to be heard and participate in the litigation' in order to satisfy due process."  Id. (quoting Phillips Petroleum v. Shutts, 472 U.S. 797, 812 (1985)).  Specifically, in a class where opt out rights are afforded, "these protections are adequate representation by the class representatives, notice of the class proceedings, and the opportunity to be heard and participate in the class proceedings."  In re Diet Drugs, 431 F.3d at 145 (citing Shutts, 472 U.S. at 811-12).  There must also be a process by which an individual class member or group of class members can challenge whether the due process protections were afforded to them, and these challenges can take the form of an appeal of the class certification itself, a collateral attack on an already-certified class, or a Rule 60(b) motion.  See Grimes, 17 F.3d at 1558; In re Real Estate Title & Settlement Servs. Antitrust Litig., 869 F.2d 760, 767 (3d Cir. 1989).

A court order approving a claim-preclusive class action settlement agreement cannot

satisfy due process as to all members of the class without adequate representation.  See Shutts, 472 U.S. at 812 ("[T]he Due Process Clause . . . requires that the named plaintiff at all times adequately represent the interests of the absent class members."); In re Diet Drugs, 431 F.3d at 145; Grimes, 17 F.3d at 1558.  "Where the class action court has jurisdiction over an absent member of a plaintiff class and it litigates and determines the adequacy of the representation of that member, the member is foreclosed from later relitigating the issue."  In re Diet Drugs, 431 F.3d at 146.  Notice and failure to exercise an opportunity to 'opt out' constitutes consent to the jurisdiction of the class action court by an absent member of a plaintiff class even when that member lacks minimum contact with the class action forum.  Carlough v. Amchem Products, Inc., 10 F.3d 189 (3d Cir. 1993).  A "challenge to the propriety of the settlement agreement and its terms" is foreclosed by the approval of the settlement agreement in a final, unappealable order.  In re Orthopedic Bone Screw Products Liab. Litig., 350 F.3d 360, 364-65 (3d Cir. 2003).  "Collateral review is only available when class members are raising an issue that was not properly considered by the District Court at an earlier stage in the litigation."  In re Diet Drugs, 431 F.3d at 146.

The Court finds that the settlement approved in the Collado/Fixler action precludes both Plaintiff Guedalia and the putative nationwide class's claims in this action, and, further, that the due process challenges Plaintiffs assert with respect to the adequacy of Plaintiff's representation and the fair and equitable nature of the Central District of California's approval of said settlement is unavailing.

First, the settlement approval order ("Approval Order") issued by Judge Real on October 17, 2011 is a final judgment and has not been appealed by Plaintiff Guedalia or any other party to

the action.[4]  Third Circuit law has found that the express terms of a settlement agreement, if judicially approved, are considered "final judgments on the merits for the purposes of claim preclusion."  Toscano, 288 Fed. Appx. at 38.  The Third Circuit has further held that, when presented with a settlement in the class action context, "the court has more than a ministerial duty to enter the negotiated settlement and release as a judgment."  Grimes, 17 F.3d at 1557.  The terms of the settlement determine the bounds of the preclusion, and in looking at the scope of the "Release of Claims" provision in the approved agreement, it is clear that claims asserted against Defendants in this action have been released since it encompasses release from "any and all legal claims or causes of action of any nature whatsoever including claims that have been or could have been asserted against Toyota, Toyota Motor Corporation, and their subsidiaries, affiliates, and suppliers, in the Actions or in any other complaint, action, or litigation in any other court or forum regarding the Class Vehicle's Headlight Parts as alleged in the Actions."  (Mallow Decl., Ex. D, "Settlement Agreement," at 12-13).

Second, the Approval Order involved the "same parties and their privies" as Plaintiff Guedalia and the putative class in this action.  As stated infra, Plaintiff Guedalia did not opt out of the Collado/Fixler action, and also received and cashed a settlement check from Toyota which resulted from the settlement reached in that action.  Further, the certified class definition is almost identical to the putative class here:

> Collado/Fixler class definition: "All purchasers and/or lessees of any 2006, 2007, 2008, or 2009 model year Toyota Prius vehicle originally factory equipped with genuine high intensity discharge ("HID") headlights who reside in the United States."  (Id., at 1).

_____

[4]On July 15, 2011, an appeal only as to Judge Real's attorneys' fees ruling in his October 17, 2011 Order was filed in the Ninth Circuit in both the Collado and Fixler actions.  See Collado, Civ. No. 10-cv-3113; Fixler, Civ. No. 10-cv-3124; Apr. 13, 2012 Hr'g Tr., at 8:23 - 9:7.

Gotthelf putative class definition: "All persons in the United States who own or lease, or have owned or leased, model years 2006, 2007, 2008, 2009, and 2010 Toyota Prius motor vehicles equipped with an optional factory-installed HID Headlamp System. ('Nationwide Class.')."  (Compl., ¶ 153).[5]

Therefore, the Court finds the parties in this action to be the same as those in the Collado/Fixler action.

Third, the instant action is based on the same causes of action as those asserted in the Collado/Fixler action.  The acts complained of and the demand for relief are identical in that the plaintiffs in Collado/Fixler alleged violations of a consumer protection statute based on the identical Prius HID headlamp product defect and requested relief in the form of extended warranties, repairs, and reimbursement.  More specifically, the wrong for which redress is sought–the product defect which simultaneously made the Class Vehicles unsafe and caused plaintiffs to suffer a loss in terms of repair–is the same in both actions.  The respective complaints in Collado/Fixler allege that Toyota knew of the defect and concealed it from consumers, that the failure to disclose the defect posed an unreasonable safety risk, and that such acts constituted fraudulent business practices.  See Collado Compl., Docket Entry No. 1, ¶¶ 1-3. While the New Jersey Consumer Fraud Act grants treble damages for those who suffer an ascertainable loss, California's Consumers Legal Remedies Act allows punitive damages for consumers who suffer any damage as a result of a method, act or practice deemed unlawful under

---

[5]Defendants argue, and offer brochure evidence supporting the contention that, the 2010 Toyota Prius did not have HID headlamps, but rather had halogen LED headlamps.  (Defs. Br., at 7 n. 3; Mallow Decl., Ex. I).  Therefore, Defendants contest Plaintiffs' inclusion of the 2010 Prius in the class definition and state that they do not have standing to pursue claims on behalf of 2010 Prius owners and lessees.  (Id.).  Plaintiffs do not contest the narrowing of their putative class definition to exclude the 2010 Toyota Prius from the broader group of Class Vehicles concerning which they seek to bring claims.

the Act.  See N.J.S.A. § 56:8-19; Cal. Civ. Code § 1780.[6]  Therefore, exemplary damages may be

recovered under both New Jersey and California law under the legal theories and facts at issue in

both actions.  In addition, the witnesses and documents at trial would be the same as in this

matter since it concerns the same reported defects and the same technological and product

failures as those alleged in Collado/Fixler.  Finally, the material facts alleged are the same in both

actions–that Unexpected Extinguishments occurred in Prius vehicles sold or leased between 2006

and 2009, and those occurrences were caused by a product defect. Thus, the Court finds that

Plaintiff Guedalia and the putative class are precluded from bringing their claims on res judicata

grounds.

Further, the Court rejects Plaintiffs' due process challenge to the Central District of

California's Final Approval Order in Collado/Fixler.  First, it is clear that Plaintiff Guedalia

received notice of the Collado/Fixler action, did not opt out of the certified class, objected to the

proposed settlement agreement, and received and cashed his settlement check under the terms of

the approved settlement agreement.  (See Mallow Decl., Ex. M; Defs. Reply Br., Ex. 1).  Second,

Plaintiffs do not contest the sufficiency of the class notice nor their opportunity to be heard and

participate in the Collado/Fixler litigation, two requirements for satisfying due process.  See

Grimes, 17 F.3d at 1560; McGowan Investors, LP v. Frucher, 392 Fed. Appx. 39, 47-48 (3d Cir.

2010).  Notice satisfies due process when it is sent by mail to each class member, contains a full

-------

[6]While treble damages are limited to threefold the amount of the ascertainable loss,
punitive damages are limited only by the Due Process Clause of the Fourteenth Amendment
prohibiting the imposition of grossly excessive or arbitrary punishments on a tortfeasor.  See
State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. 408, 416-17 (2003); Willow Inn, Inc. v.
Public Serv. Mut. Ins. Co., 399 F.3d 224, 227 (3d Cir. 2005).  Therefore, the damages available
under California law may exceed those available under New Jersey law.

disclosure of the proposed settlement and its ramifications, and notifies all class members that a hearing to determine the fairness and reasonableness of the settlement has been scheduled. Grimes, 17 F.3d at 1560.  The class notice approved by Judge Real and its distribution fulfill these requirements since the notice was court approved, it was provided to the Attorneys General of all fifty states, and the claim administrator utilized multiple mechanisms cited infra to ensure adequate notice to class members.  "Once a court has decided that the due process protections did occur for a particular class member or group of class members, the issue may not be relitigated." In re Diet Drugs, 431 F.3d at 146.

Additionally, the class action court, the Central District of California, had jurisdiction over absent members of the certified class, class members were given the opportunity to opt out of the putative class (as Plaintiff Gotthelf did), and that court determined with specificity that the class members were adequately represented, preventing class members from later relitigating the issue of adequacy of representation under Third Circuit law in In re Diet Drugs.  See In re Diet Drugs, 431 F.3d at 146; Grimes, 17 F.3d at 1557-58.  In his Final Approval Order, Judge Real reviewed the submissions of the parties, including the objection letters filed by absent plaintiffs such as Plaintiff Guedalia, and made specific findings as to the adequacy of representation.  For example, he reviewed the amount offered in the settlement, and found that it provided "various benefits to the car owners depending on the car's mileage and date of purchase, and whether or not it ha[d] already been serviced for a defect.  The settlement extends the warranty of the defective headlights at issue. . . . members can seek relief now and in the future for defects that otherwise would not be within the original warranty period and not compensable in a couple like settlement."  (Mallow Decl., Ex. H, "Final Approval Order," at 2).  In considering the extent of

discovery, the stage of the proceedings and the experience and views of counsel, Judge Real favored approval since "[s]ome discovery had taken place, the parties have propounded and responded to interrogatories, and Plaintiff's counsel appears to have a firm grasp on the strengths and weaknesses of the case.  Given counsel's substantial experience with class action settlements and opinion that the settlement is in the best interest of the class, the Court likewise agrees." (Id.).  It is not for this Court to assess the extent of discovery reviewed on the record by the Central District of California for an abuse of discretion as it is for the Court of Appeals to so review such matters; rather, the standard of collateral review of the Final Approval Order that this Court must use is whether the Central District of California met the requirements of due process in ensuring the adequacy of representation of the absent class plaintiffs.  Collateral review is only available when class members raise an issue that was not properly considered at an earlier stage in the litigation by the District Court, and since the Central District of California clearly considered the extent of discovery in its overall evaluation of the fairness, adequacy and reasonableness of the settlement pursuant to Rule 23(e), Plaintiffs may not relitigate that issue here.[7]  Plaintiffs also had the opportunity to appeal the class certification and the Final Approval

_____

[7]While Plaintiffs assert that the warranty extension in the settlement only touches 3.7% of the total class (11,000 out of 293,670), Judge Real, in assessing the reaction of the class members in its evaluation of the settlement under Rule 23(e), already considered the reach of the settlement to class members and found that only 105 members opted out, with only 22 of 239,670 class plaintiffs objecting, despite sufficient notice.  (Mallow Decl., Ex. H, "Final Approval Order," at 3).  Judge Real found that the objectors raised no significant concerns that would preclude approval of the settlement, and cited to case law stating that courts recognize "that the absence of a large number of objections to a proposed class action settlement indicates that the terms of a proposed class settlement action are reasonably favorable to the class members."  (Id.).  Finally, the Court found that "there has to be some reasonable limit to the warranty period, as any longer warranty period would defeat the purpose of a limited warranty. The parties compromised on extending the three year/30,000 mile warranty to a five year/50,000 mile extended warranty, and the Court will not upset that result."  (Id.).  Again, the issues raised

Order as to the settlement terms, and they had the opportunity to file a Rule 60(b) motion, but they did not do so.

Therefore, for the reasons stated herein, the Court finds that Plaintiff Guedalia and the putative class are precluded from bringing the claims as stated in the instant Complaint on res judicata grounds, and that the Central District of California provided sufficient due process protections to bind Guedalia and the absent nationwide class members.  The Court accordingly dismisses Plaintiff Guedalia and the putative class's claims with prejudice.

**2.  Plaintiff Gotthelf's Claims**

a.  NJCFA and Common Law Fraud Claims

Defendants argue that Plaintiffs' NJCFA and common law fraud claims should be dismissed for failure to state a claim under the heightened pleading requirements of Rule 9(b). First, with respect to Plaintiffs' NJCFA claim, Defendants cite to the Third Circuit's finding in Suber v. Chrysler Corp., 104 F.3d 578, 587 (3d Cir. 1997), in arguing that a breach of warranty alone does not violate a consumer protection statute, but rather an NJCFA claim premised on a breach of warranty requires a plaintiff to allege "substantial aggravating circumstances."  (Defs. Br., at 18-19).  To meet this standard, a plaintiff must demonstrate that the business behavior in question "stand[s] outside the norm of reasonable business practice in that it will victimize the average consumer."  Turf Lawnmower Repair, Inc. v. Bergen Record Corp., 655 A.2d 417, 430 (N.J. 1995).  Further, the District of New Jersey in Suddreth v. Mercedes-Benz, LLC held that, where an allegedly defective product was covered by a warranty, a plaintiff must sufficiently

---

and considered by the District Court in this prior litigation are not available for collateral review in this Court.

allege that the defendant manufacturer knew with certainty that the product at issue or one of its components was going to fail.  See 2011 U.S. Dist. LEXIS 126237, at * 16 (D.N.J. Oct. 31, 2011).  Plaintiffs' Complaint fails to state a claim, Defendants argue, because they fail to satisfy Rule 9(b) as to any alleged: (1) material representations by Defendants; or (2) material omissions. (Defs. Br., at 19-26).  With respect to material misrepresentations, Defendants contend that Plaintiff Gotthelf fails to allege that he saw and relied on Toyota's marketing materials prior to purchasing his Prius.  (Id., at 20).  Therefore, there is no "causal nexus" shown between the alleged unlawful conduct and any loss Plaintiff suffered.  (Id., at 21).  As to material omissions, Defendants cite to Cooper v. Samsung Elecs. Am., Inc., 2008 U.S. Dist. LEXIS 75810 (D.N.J. Sept. 30, 2008), Parker v. Howmedica Osteonics Corp., 2008 U.S. Dist. LEXIS 2570 (D.N.J. Jan. 14, 2008), and Glauberzon v. Pella Corp., 2011 U.S. Dist. LEXIS 38138 (D.N.J. Apr. 7, 2011), claiming that Plaintiff Gotthelf's allegations are conclusory in not alleging with specificity details regarding the content of the omission, when or how the decision was made to conceal the defect from customers, where the omitted information should or could have been revealed, and representative samples of advertisements, offers, or other representations.  Plaintiff does not, for example, allege that Defendants: (1) failed to conduct adequate testing; (2) failed to properly monitor and evaluate the product at issue; or (3) knew that its products were certain to fail. (Defs. Br., at 21-23).  Defendants also assert that Plaintiff Gotthelf lacks standing to allege concealment claims as to the HID headlamp replacement parts since he does not allege having actually suffered any injury or ascertainable loss from the replacement parts in his Prius.  (Id., at 24).  Finally, to the extent that New Jersey may recognize a duty to disclose information based on a safety concern under the NJCFA, Defendants argue that Plaintiff has failed to allege that

headlight failure is such a concern beyond the common and expected experience of drivers, and any notice requirement was fulfilled by Toyota's 2009 CSP Letter and the March 2011 class notice issued in the <u>Collado/Fixler</u> action.  (<u>Id.</u>, 25-26).  Regarding Plaintiff's common law fraud claim, Defendants state that, along with the arguments made <u>infra</u> with respect to the NJCFA, Plaintiff has additionally failed to sufficiently allege his reasonable reliance on any misrepresentations or omissions by Toyota.  Specifically, Defendants argue that Plaintiff points to no representations upon which he relied prior to the purchase of his vehicle.  (<u>Id.</u>, at 20).

Plaintiff claims: (1) Defendants' failure to provide notice of and offer to repair the HID headlamp was "unlawful conduct" under the NJCFA; (2) Plaintiff suffered an ascertainable loss in both the cost of repairing the HID headlamp failure and his lost expectation that the HID headlamp would last the life of his car; (3) Toyota had a duty to disclose the defect based on the safety issues involved in the extinguishments; and (4) a causal relationship between the unlawful conduct and ascertainable loss was sufficiently alleged in that Plaintiff relied on the warranty and still had to repair the HID headlamps.  (Pls. Opp'n Br., at 26-32).

Specifically, Plaintiff first argues that he sufficiently alleged facts regarding Defendants' awareness that the HID headlamp was defective while Plaintiff's warranty was in full force and effect.  (<u>Id.</u>, at 26).  That notice to Defendants is evidenced, according to the Complaint, by: complaints on the internet; complaints to the NHTSA commencing in 2007 (Compl., ¶¶ 70, 84-87); complaints received by Defendants; and the HID Headlight CSP Letter issued on December 28, 2009.  Plaintiff further claims that the "unlawful acts" were: (1) sending the December 2009 CSP Letter as a "cover-up" which did not fully disclose the defect, but rather provided unhelpful tips that concealed the fundamental latent defect, namely, Defendants' statements that the HID

bulb is strained when turned back on when still hot, even though the HID Headlamp System was not defective for that reason; and (2) promising in the warranty to correct all defects, regardless of whether the defects manifested within the warranty.  (Pls. Opp'n Br., at 26-27).  Plaintiff alleges that these tactics constituted "substantial aggravating circumstances" since they were a delay effort until the warranty expired.  (Id., at 27).  Second, Plaintiff alleges "ascertainable loss" through: (1) lost expectation in the long life of the HID headlamp; and (2) the cost of repairs. Third, Plaintiff states that he sufficiently alleged a duty to disclose by stating facts concerning the following safety concerns from extinguishments: danger to the life of the Plaintiff, third parties and animals; New Jersey legislation emphasizing the importance of headlamps; and the New Jersey Driver Manual prepared by the Department of Motor Vehicles stating that the proper use of headlights is critical to safe driving.  (Id., at 30-31).  Finally, fourth, Plaintiff asserts that he stated a sufficient causal nexus in having purchased the Class Vehicle relying on the warranty, but having to pay repairs when the defect manifested.  (Id., at 32).  With respect to his common law fraud claim, Plaintiff claims that he sufficiently stated facts showing reasonable reliance on Toyota's misrepresentations by alleging that: (1) Plaintiff was ignorant of the truth of the defect; and (2) Toyota knew that Plaintiff was relying on Toyota and Toyota's warranties when he purchased the Prius with the HID headlamp.  (Id.; Compl., ¶¶ 181, 183, 186).

The elements of a cause of action under the NJCFA are: "(1) unlawful conduct by the defendant; (2) an ascertainable loss by the plaintiff; and (3) a causal relationship between the unlawful conduct and the loss."  Prof'l Cleaning & Innovative Bldg. Servs. v. Kennedy Funding, Inc., 245 Fed. Appx. 161, 165 (3d Cir. 2007)(citing Cox v. Sears Roebuck & Co., 138 N.J. 2, 24 (1994))(other citations omitted).  The NJCFA defines an "unlawful practice" broadly as:

> The act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby . . . .

N.J.S.A. § 56:8-2.  "Courts have emphasized that like most remedial legislation, the [NJCFA] should be construed liberally in favor of consumers."  Cox, 138 N.J. at 15.  "Proof of any one of those acts or omissions or of a violation of a regulation will be sufficient to establish unlawful conduct under the Act."  Id., at 19.

To state a claim for common law fraud under New Jersey law, a plaintiff must sufficiently allege the following five elements: (1) a material misrepresentation of a presently existing or past fact; (2) knowledge or belief by the defendant of its falsity; (3) an intention that the other person rely on it; (4) reasonable reliance thereon by the other person; and (5) resulting in damages. Gennari v. Weichart Co. Realtors, 148 N.J. 582, 610 (1997). . "[C]ommon law fraud requires proof of reliance while consumer fraud requires only proof of a causal nexus between the concealment of the material fact and the loss." Zorba Contractors, Inc. v. Housing Authority, City of Newark, 362 N.J. Super. 124, 139 (App. Div. 2003).

As stated infra, allegations of fraud in federal court are subject to the pleading requirements of Federal Rule of Civil Procedure 9(b).  Rule 9(b) states that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity.  Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."  Fed. R. Civ. P. 9(b).  In pleading a fraud claim, a plaintiff must sufficiently plead circumstances surrounding the alleged fraud to put the defendant on notice of the "precise

32

misconduct with which [it is] charged." Lum v. Bank of Am., 361 F.3d 217, 223-24 (3d Cir. 2004).  A plaintiff can meet this requirement by "pleading the date, place or time of the fraud," or the plaintiff may use "alternative means of injecting precision and some measure of substantiation into their allegations of fraud."  Id. (citations omitted).   At minimum, Rule 9(b) requires plaintiffs to "identify the speaker of the allegedly fraudulent statements."  Klein v. Gen. Nutrition Co., Inc., 186 F.3d 338, 345 (3d Cir. 1999).

Plaintiff Gotthelf has failed to specifically allege either the elements of an NJCFA claim or of common-law fraud.  First, Plaintiff fails to sufficiently allege with particularity Defendants' unlawful conduct either with respect to fraudulent misrepresentations or regarding knowing omissions of material fact.  Plaintiff asserts both: (1) that Defendants' 2009 CSP Letter misrepresented the latent nature of the defect; and (2) that the warranty knowingly omitted a material fact as to the quality of the HID headlamps.  However, Plaintiff's Complaint cites to no particular marketing or advertising materials used by Defendants to sell the HID headlamps that Plaintiff himself viewed or when he may have viewed them.  While portions of Plaintiff's Complaint detail his interactions with Toyota agents regarding their representations of the nature of the problems Toyota was having with the HID headlamps upon getting his headlights repaired, neither the Complaint nor Plaintiff's Opposition Brief point to those statements as constituting the fraudulent misrepresentations made by Defendants.  Further, the "Basic Warranty" attached to Plaintiff's Opposition Brief states only that the warranty "covers repairs and adjustments needed to correct defects in materials or workmanship of any part supplied by Toyota, subject to the exceptions indicated under 'What is Not Covered,'" and the HID headlamps are not listed in the "Warranty Parts List" eligible for coverage under the warranty.  (Bernstein Decl., Ex. U, at 9,

11, 15).  The warranty, therefore, does not on its own appear sufficient to point to Defendants'
fraudulent misrepresentation as to the quality of the HID headlamps.

The December 2009 CSP Letter is also not sufficient to establish a "cover up" of the
alleged latent defect in the HID headlamps since it explicitly states that, "as the HID bulb nears
the end-of-life it may exhibit a condition where the bulb may flicker or intermittently be
inoperative.  Toyota has received reports that during the diagnostic process for this condition, in
addition to replacing the HID bulb, the HID headlight control ECU may also have been replaced
to ensure that the intermittent operation was corrected.  Upon further review of this condition,
Toyota has determined that replacement of the HID bulbs is sufficient to curtail the intermittent
operation and has voluntarily decided to reimburse customers who had their HID headlight ECUs
replaced."  (Id., Ex. M).  Plaintiff's Complaint provides no facts regarding Defendants'
knowledge with certainty, as is required in this Circuit, that the problem with the HID headlamps
was based on any other explanation than that provided in the 2009 CSP Letter so as to constitute
a fraudulent misrepresentation.

Further, all the facts detailing complaints lodged begin with complaints filed in 2007 with
the NHTSA after Plaintiff purchased the Class Vehicle at issue and entered into the warranty
agreement with Toyota, and the NHTSA only notified Toyota that it was launching a full
investigation on May 6, 2009.  (Compl., ¶ 79).  Since Plaintiff offers nothing more in the way of
facts to show Defendants' marketing and sale of the HID headlamps with the Prius, they do not
meet the required showing of unlawful conduct, let alone a "substantial aggravating
circumstance."  Even if Plaintiff could show that Defendants had a duty to disclose the defect,
they do not allege specific facts indicating that Defendants knew of the nature of the defect

before May of 2009 when they were notified of the investigation by the NHTSA.  While Plaintiff

may have sufficiently alleged that he suffered an ascertainable loss in the out-of-pocket expenses

he incurred in repairing his headlamp, without sufficient facts of Defendants' knowledge and

unlawful acts either leading up to Plaintiff's purchase or during the life of the warranty regarding

a latent defect distinct from the defect represented in Defendants' CSP Letter, Plaintiff has failed

to sufficiently state an NJCFA claim.  In addition, Plaintiff points to no representations upon

which he relied prior to the purchase of his vehicle to sustain a common law fraud claim.

Without specific factual allegations pointing to misrepresentations or knowing omissions on the

part of Defendants as to the HID headlamps, either in the warranty, the 2009 CSP Letter or other

alleged statements, Plaintiff cannot show his reasonable reliance on said misrepresentations or

omissions.

### b.  Breach of Express Warranty Claim

Defendants argue that Plaintiff's breach of warranty claims should be dismissed because:

(1) Plaintiff Gotthelf's warranty expired before the HID headlamp defects manifested,

approximately 3.5 years after purchase and after he had driven the vehicle 49,907 miles; and (2)

the unconscionability exception does not apply as the warranty was not procedurally or

substantively unconscionable.  (Defs. Br., at 26-34).  First, Defendants claim the warranty was

not procedurally unconscionable since Plaintiff was advised of an array of warranty options and

failed to purchase an extended warranty.  Second, they argue that the warranty was not so

substantively unconscionable as to shock the conscience of the court.  (Id., at 30).  Specifically,

Defendants contend that Plaintiff did not provide sufficient factual support that Defendants knew

of the defect when they issued the warranty nor does he provide support for his  contention that

35

the 3-year/36,000 mile limit was unconscionable and inadequate.  (Id., at 31-32).

Plaintiff claims that the defect in the HID Headlamp System falls within the scope of the 3-year/36,000 mile warranty because, even thought it had not manifest within that time, it still existed in his Class Vehicle.  (Pls. Opp'n Br., at 33).  In the alternative, Plaintiff argues that the warranty was unconscionable, following the District Court of New Jersey's articulation of the unconscionability exception in In re Samsung.  See, generally, In re Samsung DLP Television Class Action Litig., 2009 U.S. Dist. LEXIS 100065 (D.N.J. Oct. 27, 2009). Plaintiff asserts that his Complaint sufficiently alleges that: (1) Toyota never intended to make warranty reports to defective parts that did not fail when selling Prius vehicles after becoming aware of the defect; (2) Toyota never intended to honor the warranty at the time of the sale of affected Prius models, and did not send notice of the defective HID headlamps per the warranty when entered into or at the time Toyota became aware of said defect, at least as early as 2007; and (3) Toyota's refusal to repair the defect under the terms of the warranty caused it to be one-sided and akin to a disclaimer of the express warranty.  (Id., at 34).  Plaintiff Gotthelf further states that he took advantage of the extended warranty offered by Toyota and purchased one, but that that warranty did not cover the headlamps.  (Id.; see also Compl., ¶ 115).  Plaintiff finally argues that he has sufficiently alleged the substantive unconscionability of the warranty because: (1) Defendants knowingly sold the Prius with an undisclosed defect; and (2) industry standards call for at least five years of headlamp life.  (Id.).

To establish a breach of express warranty claim, a plaintiff "must allege (1) a contract between the parties; (2) a breach of that contract; (3) damages flowing therefrom; and (4) that the party stating the claim performed its own contractual obligations."  Frederico v. Home Depot,

507 F.3d 188, 203 (3d Cir. 2007).  As a general rule, "general warranties limited by time or

mileage do not cover repairs made after the applicable time has elapsed."  See Alban v. BMW of

N. Am., LLC ("Alban I"), 2010 U.S. Dist. LEXIS 94038, at * 19 (D.N.J. Oct. 21, 2011)(citations

omitted).  However, some courts have recognized an exception to the rule that limited warranties

will not cover post-expiration repairs if it can be shown that the warranty in question is

unconscionable.  See In re Samsung, 2009 U.S. Dist. LEXIS 100065, at * 14.  A finding of

unconscionability cannot be solely premised on allegations that a defendant knew that a defect in

the product might arise.  Suddreth, 2011 U.S. Dist. LEXIS 126237, at * 9.  If a defect manifests

after the expirations of a warranty, a complaint can thus still survive a motion to dismiss if a

court finds: (1) that the latent defect existed during the warranty period and the defendant failed

in his contractual obligations under the warranty to fix that defect regardless of the manifestation;

or (2) the warranty was procedurally or substantively unconscionable.  Procedural

unconscionability, or unfairness in the formation of the contract, "can include a variety of

inadequacies, such as age, literacy, lack of sophistication, hidden or unduly complex contract

terms, bargaining tactics, and the particular setting existing during the contract formation

process."  Sitogum Holdings, Inc. v. Ropes, 352 N.J. Super. 555, 800 (Ch. Div. 2002).

Substantive unconscionability, or excessively disproportionate terms, "simply suggests the

exchange of obligations [is] so one-sided as to shock the court's conscience."  Id.

     While this Court in In re Samsung denied a motion to dismiss plaintiff putative class's

breach of express warranty claim after the warranty for defective HDTVs had expired due to a

finding that the warranty was unconscionable, this Court in subsequent cases has followed the

pleading requirements of Twombly and Iqbal, and has been much less willing to deny motions to

37

dismiss breach of warranty claims once a warranty has expired.  In Alban v. BMW of North

America ("Alban II"), Judge Debevoise granted defendant BMW's motion to dismiss plaintiff's

breach of express warranty claim on the basis that: (1) plaintiff failed to allege unconscionability

as a matter of law since allegations regarding BMW's knowledge of a defect before the

expiration of the warranty could not serve as a basis for finding that the time-limitation in the

warranty of 48 months or 50,000 miles, whichever cam first after the date of the first retail sale,

was unconscionable; (2) allegations regarding the duration of the warranty, the lack of a

meaningful choice in determining the duration, and disparate bargaining power were conclusory;

and (3) allegations regarding BMW's knowledge of the defect before the expiration of the

warranty amounted to mere speculation.  2011 U.S. Dist. LEXIS 26754, *2 (D.N.J. Mr. 15,

2011).  Alban II rejects the argument that, even though a defect does not manifest until after the

expiration of the warranty agreement, a "plaintiff can nonetheless maintain breach of warranty

claims by alleging that the manufacturer knew about the defect at the time of the purchase."  Id.,

at * 26 (stating that plaintiff's "allegations that BMW knew that the sound insulation in his

vehicle would fail after the expiration of the warranty agreement do not indicate that the time and

mileage limitation clause was unconscionable.").  The allegations here are almost identical to

those considered in Alban II: that Defendants knew of the defect, knew that the defect would not

become apparent until after the warranty expired, and that they concealed material information

that prevented Plaintiff from bargaining for a warranty that would cover the known defect.

Therefore, under the post-Twombly and Iqbal standards as applied in Alban II, Plaintiff

Gotthelf's breach of express warranty claims as alleged cannot survive dismissal based on the

facts stated regarding unconscionability.

38

Suddreth v. Mercedes-Benz, LLC, decided by this Court in October 2011, confirms this result as it further solidifies the heightened pleading requirements regarding the unconscionability exception established in Alban II.  See, generally, 2011 U.S. Dist. LEXIS 126237.  Suddreth concerned an allegedly defective balance shaft gear in the model-year 2006 Mercedes-Benz ML 350 vehicles.  Specifically, plaintiffs alleged that their class vehicles were equipped with defective gears in their balance shafts that wore out prematurely and excessively, causing the vehicle to malfunction, the check-engine light to remain illuminated, and the vehicle to misfire and/or stop driving.  Id., at * 2.  This Court granted Mercedes-Benz's motion to dismiss plaintiff's complaint which alleged that Mercedes-Benz knew about the defect all along on the basis of its own internal arguments, a "Technical Service Bulletin,"and subsequent Mercedes diagnostic codes and manuals instructing repair technicians.  Id.  The Court found that plaintiffs did not provide sufficient factual support that defendants knew of the defect when they issued the warranties in question and failed to demonstrate why the four-year limitations period provided in the warranty was unconscionable.  Id., at * 10.  Likewise, in this case, Plaintiff does not provide sufficient facts that Defendants specifically had notice of the defect before the NHTSA 2009 investigation was announced and launched, as stated more thoroughly infra in Section III.2.a of this Opinion, and while the Court has found one-year warranty periods unconscionable in In re Samsung, a one-year warranty is much shorter than the three-year warranty provided by Defendants.  Therefore, based on the case law as it has developed since Twombly and Iqbal, Plaintiff fails to sufficiently state facts supporting the applicability of the unconscionability exception to allow his breach of express warranty claim to proceed.

c.  Breach of Covenant of Good Faith and Fair Dealing Claim

Defendants argue that Plaintiff failed to allege that Defendants breached the covenant of good faith and fair dealing by acting in bad faith or maliciously.  (Defs. Br., at 34).  Specifically, they allege that, because the defect manifested after the warranty expired, no bad faith on the part of Toyota could be alleged.  (Defs. Br., at 35).  In addition, Defendants assert that Toyota did not deny Plaintiff any benefits under the express warranty as required for an implied covenant of good faith and fair dealing claim.  (Id., at 36).  Defendants argue that, since the failures happened outside the warranty period, they did not deprive Plaintiff of the benefit of his bargain with respect to his warranty.  (Id.).

Plaintiff Gotthelf alleges a contractual relationship with Defendants in the form of the written warranty included with the purchase of his vehicle.  (Compl., ¶¶ 91, 115).  He argues that the warranty between Defendants and himself covered defects throughout the duration of the warranty period, and even though Toyota was aware of the defects, they failed to provide notice of and to repair the defect during that period.  (Pls. Opp'n Br., at 39-40).

Every contract contains an implied covenant of good faith and fair dealing.  Sons of Thunder, Inc. v. Borden, Inc., 148 N.J. 396, 420 (1997); Restatement (Second) of Contracts, § 205.  This implied covenant of good faith and fair dealing requires that "neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract."  Sons of Thunder, 148 N.J. at 420 (citations omitted).

For the reasons stated infra, Plaintiff has failed to allege sufficient facts that Defendants knew about the defect prior to Plaintiff's becoming a party to the express warranty agreement upon his purchase of his vehicle on  April 28, 2006.  Aside from general and conclusory

40

allegations as to Defendants' notice of the purported defect,[8] the earliest date on which the Complaint links reporting of the defect to Defendants is in the form of the NHTSA's notification of its launching of an investigation on May 6, 2009, after the expiration of Plaintiff's three-year/36,000 mile warranty agreement.  (Compl., ¶ 79).   Thus, without sufficiently alleging that Defendants knew of the defect during the life of the warranty, Plaintiff cannot assert that Defendants did anything that had the effect of destroying or injuring Plaintiff's right to receive the fruits of the contract.

## IV.  CONCLUSION

For the reasons set forth above, Defendants' Motion to Dismiss Plaintiff Guedalia and the Putative Class's claims is **GRANTED with prejudice**.  Defendants' Motion to Dismiss Plaintiff Gotthelf's claims is **GRANTED without prejudice** to the refiling of an amended complaint in conformity with the deficiencies stated herein.  An appropriate Order accompanies this Opinion.

DATED: May 3, 2012                                          /s/ Jose L. Linares
                                                           United States District Judge

---

[8]The Complaint, as stated infra, generally states Defendants' notice in the form of complaints, but the 2007 complaints listed in Plaintiff's Complaint were complaints made to the NHTSA, not to Defendants.  The Complaint alleges no facts supporting how such complaints would have provided Defendants themselves notice.